Mr. Cross. Good morning, Your Honors. Robert Cross, representing the appellant Loanvest IX and its general partner. And Mr. Cresson, in pro se, is at the table with me, but I will be doing the argument unless the Court has questions for him. District Judge Chabria was correct when he said at the beginning of his summary judgment opinion that this has been a long, tortured, and bizarre journey of the case stemming from a 2007 loan, which was supported by real properties of two separate affiliated endies, both of which ended up in Chapter 11 bankruptcies, and one of which ends up being in court today with us over an alleged overpayment to the debtor, to the creditor, of $455,000 and change. The judgment below and the Court's opinion, and I believe the briefs of Kensington in this case, failed to realize or distinguish the fact that under a Chapter 11 plan, a new debt, a new obligation is created which supersedes the original debt or the original loan or the original promissory note and has terms of its own which are defined in the plan and which do not relate back to whatever terms might have existed in the original obligation. Therefore, and particularly in this case, Landmark, the other debtor, which had its own separate bankruptcy case, was never mentioned in the schedules submitted by Kensington as a co-debtor. In fact, the schedule submitted by Kensington said it had no co-debtor on the loan. But you knew about Landmark? We certainly did. All the way through the bankruptcy proceedings, correct? Of course, we did, Your Honor. They didn't, there was no pulling the wool over your eyes, was there? No, sir. No, sir. We are not. So why is it so significant that they weren't listed in the schedule? It's significant to the extent that there was a separate source of payment to LoanVest, not disclosed in the schedules, not disclosed in the disclosure statement, not disclosed in the plan, whereby other creditors, had they so known. You're the one, though, that's here today arguing that you're entitled to another payment of $450,000. We are, Your Honor, because there is a new debt. So what case can you point me to that says that in this circumstance, you ought to be able to recover twice for the underlying debt? That assumes, Your Honor, that we are recovering on the same debt twice, but we are not. We are recovering on the same debt. Well, there was only one debt here, right? Before bankruptcy, yes. So you go to bankruptcy court and all of a sudden you're settled with two debts? There are two bankruptcies, there are two plans, there are now two debts. And they don't refer to each other, they don't cross-reference each other. Okay, and what case supports that? I'm sorry, Your Honor? What case? What's your best case that you say, you're going to tell me, Judge, you need to read this case, and if you read this case, we win? There is no case that we have found on similar set of facts, because this was an easily correctable problem. If it could have been corrected before the disclosure statement and plan were proposed, and it could have been corrected after that, at such point as Kensington said, oh, you think you can collect from us, quote, twice, well, we're going to amend our disclosure statement and our plan, and we'll make it clear now that anything that LoanVest pays in its separate case applies to our liability under our plan. The plan didn't say that. The disclosure statement didn't say that. But they could have said that if they had gone in either before confirmation or after confirmation under 1127, which allows you to amend your plan and disclosure statement as long as it hasn't been substantially consummated, meaning almost all of the assets being distributed to creditors. So there's plenty of opportunity here. Kensington had the opportunity to fix this problem. So is that a judicial estoppel argument, essentially? Well, it's both a judicial estoppel argument, and it's the equities argument that this is not unfair to Kensington. Kensington had caused this problem, not LoanVest. Kensington could have fixed this problem before or after plan confirmation. Instead, they did nothing. And to the Court's statement, the other creditors had the right to know that. The bankruptcy court had the right to know that. So, I mean, for judicial estoppel and perhaps also for the sort of, you know, less well-defined equitable argument, usually we are concerned with, you know, the party that makes the statement to the court, or in this case, you know, fails to make the statement, is getting some sort of advantage. What advantage do you think they got by not identifying Landberg? Well, the potential advantage is this. If other creditors, before voting on the plan, and the bankruptcy court, before confirming the plan, realized that there was a separate source of payment for a major claim in this case, namely the LoanVest claim, if there was realization among other creditors, hey, they're going to get money from another entity, not part of this, which is part of the group but not part of the plan, we can negotiate better terms. We shouldn't get away with paying this. Right, but that's their prejudice, not yours. I'm sorry? That's the prejudice, arguably, to the other creditors. What judicial estoppel requires is prejudice to you. How are you prejudiced? Well, we are prejudiced. I mean, you had actual knowledge of the debt. Well, we're prejudiced to the extent that a problem not of our making is now going to come back and bite us, which is a problem of Kensington's making, and which did give it the potential for a better outcome for itself. Had it had to pay more money into the bankruptcy case because people knew that LoanVest could be taken care of by some other entity outside the case, they would have had to pay more money. They would have ended up worse off, and the other creditors would have ended up better off. So it's the equity argument that Judge Chabria felt that this just isn't fair, doesn't sound right, is offset by the fact that it is because Kensington concealed the existence of a separate source of payment from everybody else. We knew about it, of course. I suppose you could say, oh, we should have gone into court and complained, but we didn't believe we had to complain because the court gave us, the plan gave us the rights it gave us. And we think because it's a separate new obligation and is not referencing at all whatever is paid to us from Landmark, we had the right to interpret it in our favor. They had the right to say, oh, hold on, we can fix this. If that's what you think, we'll fix that right fast and say every dollar you get from Landmark is one dollar less you're going to get under our plan. They didn't do that. So I believe the equity arguments and the estoppel arguments converge in the statement that this is how the bankruptcy code works, and therefore, it should never happen because why would two related entities file separate bankruptcy plans not mentioning one another and the source of payment of one another? They had a reason for it. I don't know what their reason was, but it did give them the opportunity to save money that they might have had to pay to other creditors had they notified the creditors what Landmark's other resources were. So what you're saying is that the other creditors had no knowledge of Landmark? There was no way they would have. They didn't have they were not in our position of having a jointly secured obligation and the schedule state disclosure statement and plan all said there was no co-debtor relationship with our on the loan vest loan. And Kensington's proposed plan did not make any reference whatsoever to Landmark? No reference whatsoever. It was easy to fix, and I don't imagine how the same affiliated entities could accidentally fail to note that and, in fact, misrepresent that there is no co-debtor on the loan vest loan, which was just false. The bankruptcy schedules are important because they tell creditors what their potential rights are and whether they should or shouldn't accept the plan. And if they vote against the plan or negotiate a vote for the plan, they can get the debtor in most cases to give them more before they can get their vote. In this case, they didn't have that choice. I would refer the Court to a statement, I think, that applies, although it's not on point, but the principle applies. It's by Justice Kaminsky in the Inouye-Perez case at 30 Fed 2nd Fed 3rd, 1209-1217, a 1994 case from this Court. He says, one obvious injury from inadequate disclosure is, in essence, being tricked. Quote, I wouldn't have voted the way I did. Unquote. One could complain. Quote, had I known the true facts. Unquote. So in that case, the party involved did know, like the loan vest did know, but the Court pointed out that that didn't mean that other creditors couldn't have been tricked by the failure to properly disclose or, more miraculously, the misdisclosure of the loan vest co-debtor relationship. So we believe that on both the interpretation of the bankruptcy code itself and on principles of equity and estoppel, any way you get to that result, the loan vest is not in the wrong at taking the plan at its word and requesting that it be paid according to the plan, the new obligation, making no reference to the landmark obligation. And if we're not persuaded by the sort of estoppel-slash-equitable arguments and we're then looking at the obligation, which, as you've said, is a new obligation created by the plan, why shouldn't we understand that new obligation to incorporate the pre-existing, the features of the pre-existing obligation and, in particular, the fact that the pre-existing obligation is now zero because it's been paid by landmark? The plan could have said that. The proponent of the plan, Kensington, could very well have said, and probably in hindsight wish they had said, there's any money you get from our affiliate landmark reduces our liability under this plan dollar for dollar, or something, or that this incorporates and is subject to the joint and several liability provisions of the original note. It could have said that. It didn't. No reference whatsoever to that. So it's not that we caused the problem. It's that Kensington caused the problem itself for reasons, you know, that we do have to somewhat speculate on, but which were entirely within its own control. How do you deal with the Schedule H co-debtors who are landmarks listed? How do we deal with it? We deal with it because... I mean, you say they're not mentioned anywhere. They're listed clearly on Schedule H. Schedules have a checkbox to say, do you have a co-debtor, and it was not checked. And so... Well, Schedule H labeled the co-debtors. They're listed. Well, there was a co-debtor on the original obligation. Now, if you take the point that this is a new obligation and now is not such a... Your point is it's not disclosed in the Schedules, and it looks like it is. No. If I'm the bankruptcy lawyer for the debtor, I'm going to want to put every piece of information in there I can because that way I can't be accused of withholding something that somebody else might have thought material later on. They didn't. Why they didn't, that's the question. But they didn't, and the question then becomes, does the bankruptcy court code and the requirement of full disclosure have any teeth if the debtor can ignore it and then get the benefit of it anyway? You're down to about three minutes. Did you want to reserve some time? I will reserve any additional time, Your Honor. I'm fine. Mr. Jacobs. Good morning, Your Honors. May it please the Court. My name is Micah Jacobs. I represent Kensington Apartment Properties LLC as the appellee and appellant on the cross appeal for the denial of attorney's fees in the debtor in this action. Well, I think as my colleague mentioned, there are no cases on point that stand for the proposition that in this situation where you have two different plans or even Kensington's plan, that it eviscerates or obliterates the underlying joint and several liability component of this original note. That part is clear. That's what both the bankruptcy judge Novak determined, and that's what Judge Chavria determined in the summary judgment orders below and in the final judgment. They considered all of these arguments that LoanVest is raising now and determined at the end of the day, none of them stand for the proposition that the original underlying debt and the joint and several liability component of that debt were removed or terminated or extinguished or obliterated. This is consistent with the Ivanhoe decision from the Supreme Court, which has not been overruled by the new Bankruptcy Act. It is still good law. It was cited in the Del Baggio case in this district, and under the Ivanhoe decision, the debtor is still required, still allowed to make the full claim or the creditor can still make the full claim. It does not say that a co-debtor has to be revealed in the plan. They can be at 100% of their claim against the debtor, but they cannot recover more. They cannot recover a double recovery. So your friendly opposition says that you were, I don't want to say acting deviously or something, but that you were, that you could have avoided this whole problem by simply disclosing forthrightly the co-obligor on the underlying debt, and that somehow or other you received an advantage. What's your response to that? Well, first of all, there's nothing in the record to indicate there was any advantage that they can cite to. Likewise, there's nothing in the record here that makes the case that other creditors were harmed by this. As your Honor pointed out, the plan itself states, nothing herein shall be deemed to release, discharge, or injunction from a creditor's right to collect and enforce its rights against guarantors, cosigners, and non-debtor parties. The notion that the note was not disclosed at all to the bankruptcy court or to the other creditors is just false. It's referenced in the original plan under the loan desk claim. It specifically refers to debtor shall make monthly payments provided in the extant loan documents executed in favor of the holder. The loan vest amendment to the plan specifically refers to the note as being essential to determine the principal balance. The loan vest amendment doesn't even provide the principal balance that was owed. It just says shall make payments and any other charges provided under the loan agreement with the debtor. So the arguments that this note was never mentioned in any of the plan, either the original plan or the loan vest amendment to the plan, and that the plan, the loan vest amendment did not incorporate or refer to or ratify the underlying note is just false. It refers directly to the loan agreement in the plan. So has the plan been substantially consummated? Yes. And as I understand the plan, you can correct me if I'm wrong, it provided in Class C for unsecured creditors to receive 100 percent of their claims. Is that right? Exactly right. So basically this was a full reimbursement Chapter 11, right? That's exactly right. So that's consistent with our argument that this plan was really not a complete extinguish or termination of the underlying note. Rather, it was a new payment plan. They extended the payment terms for 48 months after the plan, but it did not reduce the  The loan vest amendment specifically says it shall not reduce the principal of the underlying note and you have to refer to the underlying loan agreement to determine interest costs and attorney's fees. And that's all set forth in the plan. In terms of the judicial estoppel arguments, under the Ah Quin case, most of those cases as I read them refer to a debtor that fails to disclose an asset or a litigation, a cause of action. And that's indeed what was happening in the Ah Quin case where the debtor did not disclose she had a lawsuit going on against the third party. I have not seen any authorities and certainly my colleagues don't cite any authority for failure to disclose a co-debtor on a schedule. And I think there was, again, there's no facts in the record here because this didn't get to trial, but Judge Chavria noted that there was no incentive or motive to conceal or hide. This was likely an inadvertent mistake in failing to identify the co-debtor. But as your honors pointed out, LoanVest was at the table. LoanVest was negotiating its plan. LoanVest knew all about the loan and the joint and several liability. Ah Quin also, decision also makes clear that as an equitable doctrine, the court has discretion as when it can be applied and when it cannot be applied. And here in this case, I think the countervailing equities override the equity of judicial estoppel and that is to prevent a double recovery in here. And that's well-established law. That's what the district court found below that to apply judicial estoppel here would result in further inequity and allowing LoanVest to get a double recovery in this situation. Judge Chavria also noted that they had waived or forfeited the equitable estoppel defense because they did not raise it in opposition to the summary judgment papers.  But they did plead it as an affirmative defense, didn't they? I believe it was pled as affirmative defense. So you were on notice? Yeah. We were on notice in that regard. But the language that they cite that a bankruptcy plan constitutes new agreement, a new debt, a new contract, we take issue with that. I think some of the language. There's certainly quotes that say, you know, a plan is a new contract. But I think my colleagues on the other side, it's a conceptual sleight of hand to say that something is new, therefore it cannot be the same as the underlying debt is not accurate. And there is support for the proposition. This was really a new payment plan. There was no compromise on the underlying principal balance. It just affected the payment plans. And there's no language anywhere that says this eliminates the joint and several liability of that component. And I would point out that this is also this argument that they've raised for the first time when this lawsuit was filed in 2017 is contrary to their initial payment demand that precipitated this lawsuit. In that initial payoff demand, which is at 11SER02173, LoanVest demanded an additional $400,000, almost $450,000. And in its payoff demand, it gave a credit for the payment it received from the landmark. So it knew all along it was going to get a credit or give a credit to Kensington for that payment. And its arguments was that even after applying the credit it received from Landmark, the $780,000 almost, that Kensington still owed another $450,000 on top of that. And that $450,000 that they demanded in order to release the lien that they had on the property consisted of what looked to be extra default interest, which we claim default interest was not due under the plan. And they claimed attorney's fees and costs. And that's what my client paid under protest, under reservation of rights in order to have them release the lien so that they could sell the property. And then they turned around and sued for a refund. And this carries over into, I guess, our cross appeal on the denial of attorney's fees, which I can address now. But in this payoff demand, the loan vest argument was that Kensington owed an additional $450,000 even after applying the credit from the Landmark payment. They didn't come up with the argument that there's no credit, that these were two now different debts until after this lawsuit was filed. They asked for attorney's fees. And we thought that that was a question of fact that would have prevented the second summary judgment motion. Judge Chhabria made comments to the effect of denying our motion for fees to the effect that Kensington is the one that drove this litigation, that it could have been resolved much earlier in his order denying our motion for attorney's fees. He actually said, had Kensington explained the law to loan vests, perhaps this litigation could have all been avoided. I don't think there's any support for that in the record. Part of the reason I made a fairly extensive supplemental excerpt to the record is to kind of show the course of this litigation and how much work there was to be done. But we did believe that there were questions of fact that would have prevented summary judgment. That got resolved years later when we showed up for our pretrial conference, a matter of days before trial was supposed to start. And Judge Chhabria for the first time asked, what really are the factual disputes here? Couldn't this be resolved right now? And really before I could answer, Mr. Cresson for the defendants basically said, let me make this easier for you. I will stipulate to judgment right now and stipulate to alter ego, which was the first. He really wanted to appeal the summary judgment order. And he admitted in court at the pretrial conference, he stipulated that if the summary judgment order was correct, that Kensington would be entitled to a full refund of the $450,000. And that he was basically stipulating to judgment to avoid a trial. And then that's what led to Judge Chhabria's final order, addressing that and entering judgment. And so to the extent they're making appealing some of that later judgment, I would oppose that. But then we filed the motion for attorney's fees after judgment was entered. And Judge Chhabria ruled that the only way we could claim attorney's fees was through the bankruptcy plan and that the plan did not have a fee shifting provision. And we oppose that. In fact, we think that the plan itself does expressly refer to the underlying note for purposes of post-petition interest and all other charges provided under the loan agreement with debtors. So that is a reference to an incorporation of the underlying loan document. In their opposition papers, LoanVest raises arguments that nowhere in the plan does it refer to the underlying promissory note. Well, it actually expressly refers to the underlying loan agreement. And both the summary judgment order found that you had to turn to the underlying note to determine the fees and costs and loan interest. And that was an important reason to find that the underlying note still exists for purposes of both joint and several liability and for purposes of attorney's fees and costs. So we think the district court erred in denying fees as a matter of law and interpreting the note and the bankruptcy plan. If I can reserve the last minute and a half for rebuttal just on the cross-appeal aspect, or I'm not sure how the time is working on that. You may, yes. I'm not sure I'll need it. Thank you, Your Honors. Thank you, Your Honors. I will simply address the argument on the attorney fee motion, unless the Court has questions on the other, on the merits. Judge Shabria looked at this and determined in his judgment and discretion that there was not sufficient incorporation of the terms, precise terms of the promissory note, such as the attorney fee provision, to warrant deviating from the American rule that each party pays its own fees. We believe that that was within his discretion because to the extent there might have been a random mention of loan agreement in one small phrase, it did not mention the terms regarding fees. It did not state any specifics as to how that might be incorporated. And we've, in our response brief, indicated that that, for incorporation to occur, there must be more than that. We think that the Court was right to not find that there was incorporation, and I will rest on that point, Your Honor. Thank you. One last point, Your Honors. In the, Judge Shabria cited, in the order denying the fee motion, cited the NRA Pan-American case, and interestingly in that case, the Court found that there are arguments that a plan can replace an underlying note. However, and according to the decision, this is a quote, these arguments are unavailing if the terms of the plan itself do provide for the recovery of attorney fees. And in this case, they actually referred to an underlying deed of trust that had an attorney's fees provision, and the Pan-American Court wrote, in so doing, the plan ratified and incorporated the terms of the deed of trust. And we believe that's exactly what happened here. The plan here specifically refers to the underlying loan agreement as being important to reference for purposes of determining the principal balance, the appropriate interest rate, and fees and costs. And we think Judge Shabria missed that. As a matter of law, contract interpretation, and that we should be entitled to attorney's fees under the agreement, and would ask Your Honors to remand with instructions to the district judge to conduct the appropriate lodestar analysis. Thank you very much, Your Honors. Thank you. We thank both counsel for their helpful arguments, and the case is submitted.
judges: THOMAS, PAEZ, MILLER